IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CR-00351-F-8
No. 5:16-CV-00095-F

| | | |
|---|---|---|
| GEORGE MYRON ADAMS, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |

This matter is before the court on the Government's Motion to Dismiss [DE-645] George

Myron Adams' ("Adams") pending Motion to Vacate, Set Aside, or Correct Sentence pursuant to

28 U.S.C. § 2255 [DE-604]. The issues have been fully briefed, and the matter is now ripe for

ruling. For the reasons addressed below, the Government's Motion to Dismiss is ALLOWED in

part and DENIED in part and Adams' Motion to Vacate is DENIED.

### I. Factual and Procedural Background

On October 24, 2012, Adams was charged in five counts of a twenty-four count

indictment in the Eastern District of North Carolina as follows: conspiracy to manufacture,

distribute, dispense, and possess with the intent to distribute five hundred grams or more of a

mixture and substance containing a detectable amount of methamphetamine, in violation of 21

U.S.C. § 846 (Count One); possession of equipment, chemicals, products, and material with the

intent to manufacture methamphetamine, and aiding and abetting, in violation of 21 U.S.C.

§ 843(a)(6) and 18 U.S.C. § 2 (Count Five); possession of pseudoephedrine with the intent to

manufacture a methamphetamine and aiding and abetting, in violation of 21 U.S.C. § 841(c)(1)

and 18 U.S.C. § 2 (Count Six); possession with the intent to distribute five hundred grams or

more of a mixture or substance containing a detectable amount of methamphetamine and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Seven); and possession of pseudoephedrine with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1) (Count Sixteen). *See* Indictment [DE-1].

At Adams' arraignment, held on September 3, 2013, he pled guilty to Count One of the Indictment pursuant to a written plea agreement [DE-325]. Adams and the Government agreed that at sentencing the Government would move to dismiss Counts Five, Six, Seven, and Sixteen as to Adams only. *Id.* at 5. Adams' sentencing was held on February 19, 2014, and this court sentenced him to 188 months' imprisonment and a lifetime term of supervised release. *See* Judgment [DE-474]. Adams was ordered to pay a $100 special assessment, a fine in the amount of $7,300.00, and restitution in the amount of $2,479.00. *See id.* On March 4, 2014, Adams filed a Notice of Appeal [DE-486]. On March 18, 2015, the Fourth Circuit Court of Appeals dismissed Adams' appeal. *See* Mar. 18, 2015 Order [DE-534].

On February 26, 2016, Adams filed the instant *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [DE-604]. In his motion, Adams raises the following claims: (1) his sentence violates *Johnson v. United States*, 135 S. Ct. 2551 (2015); (2) his attorney provided ineffective assistance of counsel by failing to inform him of a more favorable plea offer; (3) his attorney provided ineffective assistance of counsel by failing to object to his fine; and (4) his attorney provided ineffective assistance of counsel by failing to object to his supervised release. On July 11, 2016, the Government filed a Motion to Dismiss [DE-645], arguing that Adams' motion should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because he failed to state a claim upon which relief can be granted.

2

On October 12, 2016, this court found that Adams had stated a claim for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), and the Government had not conclusively shown that Adams was not entitled to relief on the second claim in his § 2255 motion. *See* Oct. 12, 2016 Order [DE-687]. The Clerk of Court was directed to schedule an evidentiary hearing on Adams' second claim. Although Adams previously had retained counsel, this court found that he qualified for appointed counsel, and the Federal Public Defender was directed to provide representation.

On December 29, 2016, this court addressed the second claim of Adams' § 2255 motion at an evidentiary hearing [DE-703]. Adams was present and represented by appointed counsel Elizabeth Dean Hopkins Thomas. The Government was represented by Assistant United States Attorney Seth Morgan Wood. Following the evidentiary hearing, both parties filed supplemental briefing. *See* [DE-706, -708].

## II. Legal Standards

### A. 28 U.S.C. § 2255

Adams filed the instant motion pursuant to 28 U.S.C. § 2255, which provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). With a § 2255 motion, the petitioner bears the burden of proving the grounds for collateral attack by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958); *Hayes v. United States*, Nos. 4:13CR70, 4:16CV54, 2017 WL

976624, at *2 (E.D. Va. Mar. 13, 2017). When deciding a § 2255 motion, the court need not

hold a hearing when "the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief." 28 U.S.C. § 2255(b). When conducting the § 2255(b) review,

*pro se* filings are held to a less stringent standard. *See Gordon v. Leeke*, 574 F.2d 1147, 1151

(4th Cir. 1978).

## B. Federal Rule of Civil Procedure 12(b)(6)

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to

test the legal sufficiency of the complaint, not to resolve conflicts of fact or decide the merits of

the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). When

considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint

and the existence of any fact that can be proved which is consistent with the complaint's

allegations. *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

However, the "[f]actual allegations must be enough to raise a right to relief above the speculative

level" and the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

face." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[A] plaintiff's obligation to

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.

at 555 (citations omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, a court

"need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted

inferences, unreasonable conclusions, or arguments." *E. Shore Mkts.*, 213 F.3d at 180.

### III. Discussion

4

**A. Adams has failed to state a claim for relief under *Johnson* in his first claim.**

In his first claim, Adams argues that his sentence violates *Johnson*. Mot. Vacate [DE-604] at 5. In particular, Adams contends that his offense of conviction, Count One, a violation of 21 U.S.C. § 846, and the two guidelines enhancements, U.S.S.G. §§ 2D1.1(b)(1) and 2D1.1(b)(13)(C)(ii), are "unconstitutionally vague." *Id.*

In *Johnson*, the Supreme Court addressed whether increasing a defendant's sentence based on the residual clause, contained in 18 U.S.C. § 924(e)(2)(B)(ii), violates due process. 135 S. Ct. at 2551. The residual clause provided that an offense was a "violent felony" for purposes of § 924(e), if it "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Supreme Court held that "[i]ncreasing a defendant's sentence under the [residual] clause denies due process of law." *Johnson*, 135 S. Ct. at 2557. In *Welch v. United States*, 136 S. Ct. 1257 (2016), the Supreme Court held that *Johnson* applies retroactively to cases on collateral review. 136 S. Ct. at 1268.

Adams' reliance on *Johnson* is misplaced because he was not sentenced as an armed career criminal, and he did not receive a sentence enhancement based on a prior violent felony conviction. Because Adams has failed to state a claim for relief under *Johnson*, his first claim will be dismissed.

**B. Adams has failed to state a claim of ineffective assistance of counsel in his third and fourth claims.**

Adams has raised claims of ineffective assistance of counsel in his third and fourth claims. Mot. Vacate [DE-604] at 9-12. To prevail on a claim of ineffective assistance, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient

5

performance prejudiced his defense. *Strickland*, 466 U.S. at 687-88. The petitioner bears the burden of proof as to both prongs of the *Strickland* standard. *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010). Under the first prong, the petitioner must show that his counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As to the second prong, the petitioner must demonstrate that counsel's inadequate performance was prejudicial to him. *Id.* at 687. Specifically, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* With the *Strickland* standard in mind, the court will address both of Adams' ineffective assistance of counsel claims.

### 1. Adams alleges that his attorney provided ineffective assistance by failing to object to his fine and supervised release.

Adams alleges in his third claim that his attorney provided ineffective assistance by failing to object to the fine imposed by this court. Mot. Vacate [DE-604] at 9-10. In his fourth claim, Adams alleges that his attorney provided ineffective assistance by failing to object to his supervised release. *Id.* at 10-12.

Adams' third and fourth claims must fail under *Strickland* because Adams' attorney sought a downward variance from the advisory guideline range as calculated at sentencing. *See* Feb. 19, 2014 Tr. [DE-498] at 28:19-21. The advisory guideline range was calculated as 188 to 235 months' imprisonment, and Adams' attorney asked for a sentence of 120 months'

6

imprisonment. *Id.* at 25:6, 31:10. While defense counsel did not specifically request a below the guidelines fine or term of supervised release, a term of imprisonment below the guidelines would have likely resulted in a similarly reduced fine and term of supervised release. The fine imposed by this court, $7,300.00, was in fact below the advisory guideline range calculated at sentencing. *Id.* at 25:7-8 and 39:3-4. Moreover, the term of supervised release imposed by this court, life, was within the advisory guideline range. *Id.* at 25:7 and 37:6-7.

In sum, Adams has not sufficiently alleged a claim under *Strickland* because defense counsel's performance at sentencing did not fall below an objective standard of reasonableness. Moreover, Adams' third and fourth claims also fail under the second prong of *Strickland* because Adams has failed to demonstrate a reasonable probability of a different outcome at sentencing if his attorney had raised an objection to the fine or term of supervised release. Because Adams has failed to state a claim of ineffective assistance in either his third or fourth claims, both claims will be dismissed.

**C. Adams is not entitled to relief on his second claim.**

In his second claim, Adams alleges that his attorney provided ineffective assistance of counsel when he failed to convey all of the Government's plea offers. Mot. Vacate [DE-604] at 7-9. In particular, Adams contends that his attorney failed to inform him of a plea offer in which the Government would have agreed to move for the safety valve, *see* 18 U.S.C. § 3553(f). *Id.* at 8-9.

In an order entered on October 10, 2016, this court held that the Government had not conclusively shown that Adams was not entitled to relief on his § 2255 motion. *See* Oct. 12, 2016 Order [DE-687]. Because the Government failed to show that it is entitled to dismissal of

7

Adams' second claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Government's Motion to Dismiss [DE-645], as it relates to Adams' second claim, will be denied. Nevertheless, based on the December 29, 2016 hearing testimony and evidence and the record as a whole, Adams' second claim will be denied.

### 1. Applicable Law

The Sixth Amendment right to counsel extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citing *Missouri v. Frye*, 566 U.S. 133 (2012)). "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). The two-part *Strickland* test, addressed *supra* Section III.B., governs claims involving ineffective assistance of counsel during the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). As noted, *Strickland* requires a petitioner to establish that his counsel's performance was deficient, and the deficient performance prejudiced his defense. 466 U.S. at 687-88. Specific to the plea context, defense counsel has a duty to communicate to a client a formal, favorable plea agreement from the Government. *Frye*, 566 U.S. at 145. In order to establish prejudice from ineffective assistance of counsel in a case involving a plea offer, a petitioner is required to demonstrate a reasonable probability that (1) he would have accepted the earlier plea offer had he been provided with effective assistance of counsel, and (2) the plea would have been entered without the prosecution canceling it or the court refusing to accept it. *Merzbacher v. Shearin*, 706 F.3d 356, 366 (4th Cir. 2013) (citing *Frye*, 566 U.S. at 147; *Lafler*, 566 U.S. at 164).

### 2. Evidentiary Hearing Testimony

#### a. Petitioner Adams

8

At the December 29, 2016 evidentiary hearing, Adams testified that he is from Benson, North Carolina. Adams recalled having a "little bit" of trouble in school, and in particular, with reading comprehension. Adams is currently incarcerated in McCreary, Kentucky, where he is serving a federal sentence of 151 months' imprisonment.

Adams' attorney before this court was John "Jack" O'Hale ("O'Hale"). At the beginning of 2013, Adams met with O'Hale for the first time after being federally indicted. This initial meeting took place at the New Hanover County Detention Center, and Adams and O'Hale discussed Adams' case. They talked about how they would handle the case and whether it would go to trial. Adams and O'Hale focused their discussions on the issue of pre-indictment delay. At the time, Adams' understanding was that they would fight the case.

As early as June 2013, O'Hale was discussing the safety valve provision with Adams. O'Hale never advised Adams that time was of the essence in accepting a plea with the safety valve provision, and if he had, Adams would have pled guilty earlier. Adams learned the safety valve was "dead in the water" when he and O'Hale started discussing a plea. Adams was never offered a plea agreement with a safety valve stipulation in it. According to Adams, he was told by fellow inmates that he should have gotten the benefit of the safety valve because he had never been in any trouble.

Assistant United States Attorney Jennifer E. Wells ("AUSA Wells") referred to the safety valve plea as "dead in the water," which meant to Adams that he had no chance of getting it. Adams later learned that AUSA Wells had at one point supported him receiving the safety valve.

Around the end of 2013, O'Hale advised Adams that he should take a plea deal. By that time, Adams' codefendants had all pled guilty. Adams thought that he would be held

9

accountable for the drug weight set forth in the bill of particulars, and he was surprised when he was held accountable for an additional one hundred grams.

At the evidentiary hearing, Adams was asked about a letter dated June 20, 2013 that was addressed to him from O'Hale. *See* Gov't's Ex. 2. In the letter, O'Hale discussed the "firearm issue" and advised Adams that there would be testimony that he possessed a firearm on Savage's property. O'Hale informed Adams that if the Government stipulated or if the judge found that he did not possess a weapon with respect to the drug offense, he may be eligible for a safety valve reduction. While Adams denied that he and O'Hale were discussing a guilty plea at that time, the letter addressed the issue and specifically states that Adams would be required to plead guilty to Count One.

Adams acknowledged that an August 8, 2013 letter to him from O'Hale states that some of the evidence tends to show that he possessed a firearm while he patrolled Savage's property. *See* Gov't's Ex. 4. Adams admitted the letter also referred to his plea offer to the conspiracy count. Adams' plan, as written out and signed by him on August 11, 2013, was that he was willing to plead guilty but still wanted to litigate the safety valve issue.

In a letter from O'Hale to Adams, dated August 16, 2013, O'Hale advised Adams that he informed the Government that Adams would plead guilty to conspiracy, with an understanding that he could preserve his appellate rights if he lost on the safety valve issue. *See* Gov't's Ex. 5. O'Hale informed Adams that the Government responded that they would not enter into such a plea agreement. In the same letter, O'Hale advised Adams that several witnesses placed him in the possession of a firearm on Savage's property. O'Hale suggested it could be argued that the alleged possession of a firearm was only to safeguard Savage's property, not to further the

10

conspiracy. Adams' plan following receipt of this letter was to plead guilty, subject to getting

acceptance of responsibility and doing a debriefing.

At the evidentiary hearing, Adams was also questioned about his plea agreement with the

Government. *See* Gov't's Ex. 6. Adams acknowledged that there was just one stipulation in the

plea agreement, and it addressed acceptance of responsibility. Adams admitted there was

nothing in the plea agreement about the safety valve, and when he entered into the plea

agreement he wasn't going to get the safety valve. Adams never asked O'Hale to withdraw his

guilty plea.

### b. John P. O'Hale

At the December 29, 2016 evidentiary hearing, O'Hale testified that although his name is

John Peter O'Hale, he is generally known as Jack O'Hale. O'Hale, an attorney-at-law, has

practiced law for forty-one years. He is licensed to appear in all North Carolina federal district

courts, the Fourth Circuit Court of Appeals, and the United States Supreme Court. O'Hale has

tried, both state and federal combined, approximately three hundred cases. O'Hale explained

that he has cut back his federal practice. From 1985 to 2010, 35% of his practice was federal, but

over the last five years, only 5-10% of his practice has been federal.

O'Hale explained that he has known Adams for a long time. O'Hale represented Adams

in a state case related to the federal prosecution that was the subject of this case. O'Hale was

successful in getting the state case dismissed for lack of a speedy trial. In the federal case,

Adams was initially represented by appointed attorney Michael Christopher Fitzpatrick. Then,

Adams' father contacted O'Hale and asked him to visit Adams and determine if he would

provide representation in the federal case.

11

On February 10, 2013, O'Hale went to the New Hanover County Jail and began representing Adams. O'Hale had an idea what the case was about because he called Joe Zeszotarski, the attorney who represented Savage, the lead defendant in the case. On February 13, 2013, O'Hale had an opportunity to meet with AUSA Wells and discuss Adams' case. O'Hale had a "cheat sheet" Zeszotarski had gotten from AUSA Wells, which set forth what the Government believed to be the relevant conduct and drug weight for each person in the conspiracy.

At the time of the first meeting with AUSA Wells, O'Hale had not received any discovery, but it was his understanding at that time that there were no firearms in the case. Based on this belief and Adams' lack of a prior criminal record, O'Hale asked "right out of the gate" whether AUSA Wells thought Adams was entitled to the safety valve. AUSA Wells indicated that she thought he might be, but she could not say for sure at that time. In August 2013, a large packet of discovery came that contained statements from various individuals who all placed a firearm in Adams' hands. Discovery in Adams' case was forthcoming up until January 2014.

In an email dated June 18, 2013, authored by O'Hale and directed to AUSA Wells, O'Hale inquired about the possibility of the safety valve. *See* Gov't's Ex. 1. In a letter from O'Hale dated June 20, 2013, Adams was provided a status update on his case, which included preliminary offense level and Guidelines calculations. *See* Gov't's Ex. 2. O'Hale advised Adams that AUSA Wells would require him to plead guilty to Count One of the Indictment. O'Hale informed Adams that it was impossible to come to a reasonable estimation of his drug accountability based on the discovery O'Hale had reviewed up to that point and that there was evidence from various witnesses indicating they saw Adams possess a firearm on Savage's

12

property. O'Hale and Adams agreed that they would continue their investigation and not make a final decision regarding any plea arrangement at that time.

O'Hale and Adams discussed the safety valve from the very beginning. At some point after June 20, 2013, O'Hale told Adams that the safety valve was "dead in the water." First, the Government would not budge on the issue at all. Second, the discovery revealed multiple witnesses who put a firearm in Adams' possession during the conspiracy in close proximity to where the methamphetamine was allegedly manufactured.

O'Hale sent a letter to AUSA Wells, via email and U.S. mail, on August 8, 2013. *See* Gov't's Ex. 3. The letter addressed what O'Hale was discussing with AUSA Wells in person, which was that even though the evidence indicated that Adams possessed a firearm while he was on Savage's property and during the course of the conspiracy, the evidence did not indicate that the firearm was used to facilitate any methamphetamine cooks, distribution, or possession with the intent to manufacture methamphetamine. O'Hale asked AUSA Wells to talk with her superiors and find out if the Government could stipulate to or would agree not to object to the argument that Adams was eligible for the safety valve. Sometime thereafter, AUSA Wells called back and advised O'Hale that her superiors would not allow her to enter into that kind of agreement.

O'Hale authored a letter to Adams that was hand delivered on August 11, 2013, which reveals that Adams authorized and instructed O'Hale to inform AUSA Wells that he would plead guilty to the conspiracy count on the condition that he not waive any appellate rights to litigate the safety valve issue and the Government would debrief him. *See* Gov't's Ex. 4. O'Hale explained that he pursued the issue vigorously because the mandatory minimum sentence Adams

13

faced was ten years, and they were trying to get it down as low as possible.

At the evidentiary hearing, O'Hale referred to a letter he wrote to Adams on August 16, 2013. *See* Gov't's Ex. 5. The letter, signed by Adams in the New Hanover County Jail on August 17, 2013, was written to update Adams on the plea negotiation process. O'Hale informed Adams that on August 15, 2013, he received an email from AUSA Wells, which stated that her supervisors would not allow her to enter into the requested agreement. O'Hale also discussed his view of the likelihood of success on the safety valve issue. O'Hale advised Adams that it would be a factual determination by the court at the sentencing hearing and that they would likely lose on the issue because the burden of proof is just a preponderance of the evidence. Moreover, the Government had numerous witnesses who would say Adams possessed a firearm on Savage's property.

O'Hale recommended that Adams plead guilty to Count One of the Indictment because that was the only thing being offered by the Government. O'Hale never told Adams that he had an opportunity to enter a guilty plea with a safety valve. O'Hale explained that it was his goal and they pursued the issue hard, but it just never came to fruition. There were no other plea offers from the Government. As of August 16, 2013, O'Hale and Adams agreed that Adams would plead guilty to the conspiracy. O'Hale planned to notify AUSA Wells that Adams would enter into a plea agreement, provided that the Government acknowledged Adams was entitled to a three-level downward adjustment for acceptance of responsibility and would be debriefed before sentencing.

Adams ultimately entered into a written plea agreement with the Government on August 28, 2013. *See* Gov't's Ex. 6. O'Hale reviewed the memorandum of plea agreement with Adams

14

at the New Hanover County Jail. O'Hale allowed Adams to ask questions about the plea agreement, and O'Hale answered each question. After Adams pled guilty, he never asked O'Hale to withdraw his guilty plea.

O'Hale sent a letter to Gabe Hardison, the U.S. Probation Officer who prepared Adams' Presentence Report ("PSR"). *See* Gov't's Ex. 8. The purpose of the letter was to set forth objections to the draft PSR. With respect to the firearm issue, O'Hale's position was that Adams acknowledged he resided on a part-time basis at Savage's residence from the end of November 2009 through April 2010. During that period of time, Adams had possession of a firearm on approximately six occasions, but Adams' possession of the firearm did not occur during any methamphetamine cooks or drug transactions. Adams admitted possession of a firearm but claimed he walked on that portion of Savage's property where the storage buildings and fuel storage tanks were located in an attempt to determine whether any gasoline, diesel fuel, or any other property had been stolen. Thus, Adams' position was that he possessed the firearm, but it wasn't in connection with a drug crime.

At the evidentiary hearing, O'Hale referred to the February 4, 2014 letter he sent to Adams. *See* Gov't's Ex. 9. In the letter, O'Hale advised Adams that after doing a lot of research and speaking with the probation officer, he decided it was not in Adams' best interest to pursue the objections. O'Hale withdrew the objections with the thought that if a mini trial got started, Adams might end up losing his acceptance of responsibility.

Prior to sentencing, O'Hale filed a sentencing memorandum with character letters on Adams' behalf. O'Hale withdrew his objections regarding possession of a firearm because he did not want to be seen as litigating a frivolous issue and blurring the greater picture of getting a

15

variance based on drug weight and a limited role in the conspiracy. In the sentencing memorandum, O'Hale argued that Adams had a limited role in the conspiracy, but he did not raise the issue about the possession of a firearm because of the number of witnesses who saw Adams with a gun on Savage's property. O'Hale believed they could not win on the firearm issue and feared losing acceptance of responsibility.

At sentencing, Adams got a sentence of 188 months' imprisonment. This sentence was greater than he would have received if he had gotten the benefit of the safety valve provision. However, according to O'Hale, Adams was not entitled to the safety valve provision. O'Hale explained that legally it doesn't take much to have a firearm if it's exposed and carried openly by someone who is in a drug conspiracy.

O'Hale felt there were appellate issues for Adams to raise, and he assisted Adams with his direct appeal. In particular, O'Hale drafted a brief and instructed Adams to file it with the Fourth Circuit Court of Appeals.

Adams had an issue understanding "big words." In light of this, O'Hale always read and explained everything to him. When they met, O'Hale read each letter to Adams and delivered a duplicate copy to him. O'Hale also gave Adams an opportunity to ask questions about each of his letters. Each time Adams and O'Hale met, they talked about Adams' case. During their discussions, O'Hale believed that Adams asked intelligent and thoughtful questions and was deeply involved in the decision-making process.

### 3. Discussion

Adams' allegations, as contained in his § 2255 motion, are contradicted by O'Hale's evidentiary hearing testimony and the record as a whole. Thus, whether O'Hale provided

16

deficient performance under the first prong of the *Strickland* standard requires a credibility determination.

When assessing the credibility of witnesses, a court can consider "variations in demeanor and tone of voice." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). A court can also consider documents and objective evidence that may contradict the witness's testimony or show inconsistencies, *id.*, as well as the witness's motive to lie and the specificity of his statements, *Jackson v. United States*, Nos. 5:07-CR-110-FL-1, 5:12-CV-205-FL, 2014 WL 7149635, at \*4 (E.D.N.C. Dec. 15, 2014) (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

Although Adams has alleged that his attorney, O'Hale, failed to inform him of a plea offer in which the Government would have agreed to move for the safety valve, Mot. Vacate [DE-604] at 7-9, the evidence presented at the December 29, 2016 evidentiary hearing does not support this claim. In fact, at the evidentiary hearing, Adams admitted that he was never offered a plea with a safety valve. Rather, Adams testified that fellow inmates told him he qualified for the safety valve, with the implication was there *must* have been such an offer from the Government. There was absolutely no evidence that such a formal plea offer ever existed. O'Hale testified that there was only one plea offer from the Government, and it was the agreement Adams ultimately signed. *See* Gov't's Ex. 6. That plea agreement contained only one stipulation, and it dealt with acceptance of responsibility. *Id.* at 7.

O'Hale testified that the Government did *not* offer Adams a safety valve agreement, but O'Hale did testify that he tried to persuade AUSA Wells to allow Adams the benefit of the safety valve. As the record reflects, as early as June 18, 2013, O'Hale emailed AUSA Wells to argue

17

that Adams appeared to be eligible for the safety valve. *See* Gov't's Ex. 1. Then, on August 8, 2013, O'Hale contacted AUSA Wells, by letter and email, to revisit the safety valve issue. *See* Gov't's Ex. 3. On August 12, 2013, O'Hale met with AUSA Wells and SBI Agent Page and advised AUSA Wells that Adams would enter a guilty plea to the conspiracy count with the understanding that he would preserve his appellate rights in the event that there was an adverse determination by the court regarding his eligibility for the safety valve. *See* Gov't's Ex. 5. On August 15, 2013, AUSA Wells advised O'Hale that her supervisors would not permit her to enter into the plea agreement sought by O'Hale. *See id.* Given this position by the Government, Adams agreed to sign the plea agreement that had been offered to him. *Id.* at 3.

O'Hale's testimony at the evidentiary hearing is fully supported by the Government's exhibits. This court credits the testimony from O'Hale and the Government's supporting exhibits over Adams' bare allegations. Accordingly, Adams has failed to establish his claim under the first prong of the *Strickland* standard.

Adams has also failed to establish his claim under the second prong of the *Strickland* standard. Adams cannot establish a reasonable probability that even if the alleged safety valve plea existed and was conveyed to Adams, this court would have accepted the plea. In order for the safety valve to apply to Adams, this court would have had to determine that he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon . . . in connection with the offense." 18 U.S.C. § 3553(f)(2). As noted in the PSR, which was adopted by this court without change, Adams served as an "armed lookout" in support of the conspiracy. PSR [DE-448] at 13 ¶ 19. Also, Adams was directed by Savage, who provided the firearms, to guard the residence during the cooks. *Id.* at 9 ¶ 16. Moreover, O'Hale informed Adams that

18

there were at least three witnesses who placed Adams in possession of a firearm on Savage's property, and O'Hale, a seasoned criminal defense attorney, expressed skepticism that a safety valve argument would be successful. Gov't's Ex. 5 at 2.

In sum, Adams has failed to establish, by a preponderance of the evidence, both prongs of the *Strickland* standard. Consequently, Adams' second claim must be denied.

## IV. Conclusion

For the foregoing reasons, the Government's Motion to Dismiss [DE-645] is DENIED in part and ALLOWED in part and Adams' Motion to Vacate [DE-604] is DENIED.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, this court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2) (A certificate of appealability will not issue unless there has been "a substantial showing of the denial of a constitutional right."); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (holding that in order to satisfy § 2253(c)(2), the petitioner must demonstrate that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong, but when a district court denies relief on procedural grounds, the petitioner must demonstrate both that the dispositive procedural ruling is debatable and that the motion states a debatable claim of the denial of a constitutional right).

SO ORDERED.

This the 2 9 day of March, 2017.

*James C. Fox*

JAMES C. FOX
Senior United States District Judge

Case 5:12-cr-00351-BO  Document 709  Filed 03/29/17  Page 19 of 19